J-S51002-18 & J-S51003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: H.D.H. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.A.R., MOTHER | : | No. 1209 EDA 2018 |

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2017-A0165

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.E.H. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.A.R., MOTHER | : | No. 1211 EDA 2018 |

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2017-A0166

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.L.H. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.A.R., MOTHER | : | No. 1212 EDA 2018 |

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2017-A0167

J-S51002-18 & J-S51003-18

IN RE: ADOPTION OF H.D.H.   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
   :
   :
   :
   :
   :
APPEAL OF: J.H., FATHER   :   No. 1441 EDA 2018

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court
at No(s):  2017-A0165

IN RE: ADOPTION OF A.E.H.   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
   :
   :
   :
   :
   :
APPEAL OF: J.H., FATHER   :   No. 1442 EDA 2018

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court
at No(s):  2017-A0166

IN RE: ADOPTION OF A.L.H.   :   IN THE SUPERIOR COURT OF
   :   PENNSYLVANIA
   :
   :
   :
   :
   :
   :
   :
APPEAL OF: J.H., FATHER   :   No. 1443 EDA 2018

Appeal from the Decree April 6, 2018
In the Court of Common Pleas of Montgomery County Orphans' Court
at No(s):  2017-A0167

BEFORE:  DUBOW, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY DUBOW, J.:       **FILED OCTOBER 18, 2018**

In these consolidated appeals, F.A.R. ("Mother") and J.H. ("Father") (collectively, "the Parents") appeal from the decrees entered April 6, 2018, terminating involuntarily their parental rights to their minor children, H.D.H., a male born in July 2010, A.E.H., a female born in December 2012, and A.L.H., a female born in August 2015 (collectively, "the Children"). Because the record supports the decision of the orphans' court, we affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

This family came to the attention of the Montgomery County Office of Children and Youth ("OCY") in June 2016 when the Children were 10 months, 3 years, and 5 years old, after receiving a referral alleging substance abuse and neglect by the Parents. N.T., 12/12/17, at 8. During a meeting with the OCY caseworker in July 2016, Mother admitted that she had neglected the Children's medical care in that H.D.H. and A.E.H. had not been to a pediatrician in years, and A.L.H. had not been to a pediatrician since birth. *Id.* at 9-10. None of the Children had ever been to a dentist, and the Parents had not registered H.D.H. for school, despite his being nearly six years old at the time. *Id.* at 9-11. In addition, Mother reported that Father had committed domestic violence against her in the past, and that she was addicted to Percocet, although she had been clean for approximately five years. *Id.* at 10-11. She denied any substance abuse by Father.[1] *Id.* at 11.

---

[1] Despite Mother's claim, the OCY caseworker suspected that Father was under the influence of substances during a later interaction in July 2016. N.T., 12/12/17, at 43 ("He was very fidgety, agitated, not able to focus.").

At the time OCY became involved with the Children, all three of them suffered from cognitive limitations or developmental delays. Both H.D.H. and A.E.H. are autistic and were nonverbal. *Id.* at 46-47. A.L.H. appeared to lack muscle tone and could not stand, even with someone holding her arms. *Id.* at 47. None of the Children was toilet trained, and each of them suffered from severe, oozing diaper rashes. *Id.* at 14, 53-54.

In July 2016, Mother sent text messages to the OCY caseworker, stating that Father was engaging in domestic violence, and that she feared for her safety and for that of the Children. *Id.* at 12-13. OCY assisted Mother and the Children in leaving the residence and going to a domestic violence shelter. *Id.* at 13. However, Mother provided Father with the location of the shelter, which was confidential, and he retrieved both her and the Children and took them back to the residence. *Id.* at 15. As a result, OCY obtained emergency custody of the Children on July 28, 2016, and the juvenile court adjudicated them dependent on August 9, 2016. At the time of the placement, H.D.H. was 6 years old, A.E.H. was 3 and 1/2 years old, and A.L.H. was just under one year old.

On September 20, 2017, OCY filed Petitions to Involuntarily Terminate the Parents' rights to the Children. The orphans' court conducted a hearing on December 11, 2017, December 12, 2017, December 14, 2017, and April

3, 2018.[2] On April 6, 2018, the court entered decrees terminating the Parents' rights.

In its opinion accompanying the decrees, the orphans' court found that the Parents were incapable of parenting the Children, and that termination of their parental rights would best serve the Children's needs and welfare. Orphans' Court Opinion, 4/6/18, at 12-19; 23 Pa.C.S. § 2511(a)(2), (b). The court reasoned that the Parents made progress toward addressing their substance abuse and domestic violence issues. Orphans' Court Opinion, 4/6/18, at 15. However, they remained unable to provide the Children with the structure, routine, stability, and access to services necessary for them to grow and succeed. *Id.* The court further reasoned that the Children have a weak and insecure bond with the Parents, and that severing that bond would not be detrimental to them. *Id.* at 18-19. The court noted that the Children progressed significantly since entering foster care, and that OCY was working

---

[2] During the termination hearing, the Children had the benefit of a guardian *ad litem* ("GAL"), William Manning, Esquire. Notably, the record is clear that the Children's legal interests and best interests were not in conflict. A.L.H. was only two years old at the time of the hearing, and was too young to express her preferred outcome. While H.D.H. and A.E.H. were seven and five years old respectively, they both exhibited limited verbal skills due to their autism. The record indicates that neither child spoke in complete sentences and could only do things like say their name, count, and identify body parts. N.T., 12/11/17, at 85-86; N.T., 4/3/18, at 47. Thus, they were also incapable of expressing their preferred outcomes. Therefore, representation by the GAL satisfied the Children's right to counsel pursuant to 23 Pa.C.S. § 2313(a). **See In re T.S.**, ___ A.3d ___, 2018 WL 4001825 at *10 (Pa. 2018) (holding that a very young and pre-verbal child's right to counsel is satisfied when the orphans' court appoints an attorney-GAL who represents the child's best interests).

to identify a pre-adoptive home. *Id.* at 19. The court placed particular emphasis on the testimony of psychologist William Russell, Ph.D., who conducted parental capacity assessments and a bonding evaluation of the Parents and the Children. *Id.* at 12-15, 17-18. The court emphasized Dr. Russell's findings that the Parents lack the capacity to meet the Children's needs, and that the Children do not view the Parents as having a central place of importance in their lives. *Id.* at 14, 17-18.

Mother timely filed notices of appeal from the termination decrees on April 24, 2018, along with concise statements of errors complained of on appeal. Father timely filed his own notices of appeal and concise statements of errors complained of on appeal on May 1, 2018. The orphans' court issued supplemental opinions pursuant to Pa.R.A.P. 1925(a) on April 26, 2018, and May 4, 2018.

**ISSUES ON APPEAL**

Mother raises the following claims for our review:

1.) Whether there is sufficient evidence to support the findings of [the orphans' c]ourt that [OCY] proved by clear and convincing evidence the requirements of 23 Pa.C.S.[ § ]2511(a)(2) for the involuntary termination of [] [M]other's parental rights?

2.) Whether [the orphans' c]ourt abused its discretion in finding that the developmental, physical and emotional needs and welfare of A.E.H.[3] will be best served by the termination of [] Mother's

---

[3] While Mother included only A.E.H. in her Statement of Questions involved, this appears to be a typographical error. Mother included all three Children in her concise statements of errors complained of on appeal and the argument section of her brief pertains to all three Children.

parental rights pursuant to 23 Pa.C.S. [§] 2511(b), when there is a strong and loving bond between [] Mother and the child, and severance of that bond will cause irreparable harm to the child?

Mother's Brief at 4.

In addition, Father raises the following claims:

1.) Whether there is sufficient evidence to support the findings of [the orphans' c]ourt that [OCY] proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§] 2511(a)(2) for the involuntary termination of [] Father's parental rights?

2.) Whether [the orphans' c]ourt abused its discretion in finding that the developmental, physical and emotional needs and welfare of A.E.H., H.D.H., and A.L.H., will be best served by the termination of [] Father's parental rights pursuant to 23 Pa.C.S. [§] 2511(b), when there is a loving bond between [] Father and the [C]hildren and severance of that bond will cause irreparable harm to the [C]hildren and that [F]ather's alleged incapacity cannot be remedied within a reasonable period of time with available intervention[?]

Father's Brief at 4.

**LEGAL ANALYSIS**

Our standard of review in involuntarily termination of parental rights matters requires us to determine whether the record supports the findings of the orphans' court, and, if so, whether the court committed an error of law or abuse of discretion:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

- 7 -

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated the parental rights of both Parents pursuant to Section 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \*\*\*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 8 -

*** 

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

This Court has explained the requisite analysis pursuant to Section 2511(a)(2) as follows:

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

With respect to Section 2511(b), this provision requires an analysis of whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

**Mother's appeal**

We begin by considering Mother's first claim, in which she argues that the orphans' court abused its discretion by terminating her parental rights pursuant to Section 2511(a)(2). Mother contends that she was in substantial compliance with her Family Service Plan ("FSP") goals. Mother's Brief at 7-

10. She asserts that she participated in visits and maintained housing, and that she attended domestic violence counseling, parenting classes, and a drug and alcohol evaluation. *Id.* at 9-10. She also asserts that she made efforts to address the special needs of H.D.H. and A.E.H. *Id.* at 10.

Our review of the record reveals no abuse of discretion by the orphans' court, and the record supports the trial court's factual findings. During the termination hearing, the court heard the testimony of OCY caseworker, Lisa Mongan. Ms. Mongan testified that OCY prepared a series of FSP goals to assist the Parents in achieving reunification with the Children. N.T., 12/12/17, at 17. These goals included maintaining a bond with the Children, providing and maintaining living conditions free from health and safety hazards, understanding and addressing developmental delays and physical disabilities, showing an understanding of age-appropriate behavior and expectations, getting needed and preventative health and dental care, achieving and maintaining recovery from substance abuse, and addressing mental health needs. *Id.* at 19.

Ms. Mongan testified that Mother initially failed to comply with her goals. *Id.* at 21. Mother completed a drug and alcohol evaluation in September 2016, which did not recommend further treatment. *Id.* at 100-01. However, Mother admitted in October 2016 that she was facilitating Father's substance abuse by filling her prescription for Adderall and providing it to him. *Id.* at 25-26. OCY referred the Parents for reunification services through the Time Limited Reunification program, but the program discharged them in December

2016 for refusing to cooperate. *Id.* at 20-21. Further, Mother maintained her relationship with Father despite his acts of domestic violence. Father was arrested in February 2017 after striking Mother in the face. *Id.* at 37. Mother reported to Ms. Mongan that Father struck her in January 2017 as well. *Id.* at 38. In June 2017, Father pled guilty to simple assault and received a sentence of two years of probation. Exhibit OCY-13B (documents relating to Father's February 2017 criminal charge).

Ms. Mongan explained that Mother did not begin to cooperate with her FSP goals until May 2017, nearly a year after the Children entered foster care. N.T., 12/12/17, at 21. Mother began attending mental health treatment, as well as a domestic violence program. *Id.* at 36-37. Mother also completed a parenting program in November 2017. *Id.* at 78. Ms. Mongan noted that the Parents' home was appropriate, although their electricity had been shut off for a brief period in July 2017, and they owed approximately $6,000 to the electric company. *Id.* at 23-24.

Despite this recent progress, Ms. Mongan opined that Mother lacked the capacity to parent the Children. *Id.* at 45-46, 49. She explained that the Parents failed to demonstrate that they could meet their own needs for the past year, let alone meet the Children's needs. *Id.* at 120. Moreover, she observed that the Parents had done nothing to learn how to address the autism of H.D.H. and A.E.H. *Id.* at 39, 49. Ms. Mongan emphasized that the Children improved significantly while in foster care. *Id.* at 46. H.D.H. is now better behaved and possesses limited verbal skills, such as being able to say

his name and identify his eyes, ears, and nose. *Id.* at 46-47. A.L.H. has overcome her physical limitations and is "talking a lot, walking, running. She's doing everything." *Id.* at 47-48.[4]

In addition, as noted above, the orphans' court heard the testimony of Dr. Russell, who conducted a parenting capacity evaluation of Mother. Dr. Russell expressed concern regarding Mother's mental health. He testified that she suffered from a traumatic upbringing, and engaged in substance abuse starting in her adolescence. N.T., 4/3/18, at 14-15. He opined that Mother has not received treatment adequate to address these issues, and that she suffers from depression and displays problems with anger. *Id.*

Dr. Russell further testified that Mother minimizes her responsibility for the circumstances leading to the Children's placement. *Id.* at 16. He found it significant that the Parents delayed in addressing those circumstances by complying with services. *Id.* at 19-20. He theorized that the Parents' recent progress might indicate that they are afraid of losing custody of their new baby,[5] or that they "just don't want to see themselves as being said that they couldn't care for their children[.]" *Id.* at 20-21. Ultimately, Dr. Russell opined

---

[4] Ms. Mongan testified that A.E.H. has not improved to the same extent as H.D.H. and A.L.H. N.T., 12/12/17, at 47. Nonetheless, the record indicates that she has made improvements. Foster care program coordinator, Felicia Clayton, testified that A.E.H. is now better behaved, more verbal, and more active. N.T., 12/11/17, at 57.

[5] Mother gave birth to a boy, N.T.H., in January 2018. N.T., 4/3/18, at 95-96.

that Mother is unable to parent the Children safely. *Id.* at 23. He summarized the bases for his conclusion as follows, in relevant part:

> [Mother] has only recently begun to work on the multitude of issues she faces. She has only recently begun to address her longstanding history of isolation, depression, and enabling her boyfriend's addictive and violent behavior. Long lasting change will take time, effort and significant support. The unaddressed emotional trauma from her childhood, her substance abuse, her neglect of her children, her many emotional losses, the difficult relationship with [Father] and the normal stressors related [to] caring for and raising a newborn make a lengthy and complex basis for therapeutic intervention.

Exhibit OCY-17 (Report of Forensic Evaluation - Mother) at 7.

The record supports the finding of the orphans' court that Mother is incapable of parenting the Children and that she cannot or will not remedy her parental incapacity. It was within the court's discretion to accept the testimony of Ms. Mongan and Dr. Russell, and to conclude that Mother's belated efforts at reunification were not sufficient to preserve her parental rights. As this Court has stated, "a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2012).

Next, we consider Mother's claim that the orphans' court abused its discretion by terminating her parental rights pursuant to Section 2511(b). Mother argues that she and the Children share a significant bond. Mother's Brief at 11. She emphasizes that she attended visits with the Children as well as their individualized education program meetings. *Id.*

Our review of the record belies Mother's claim. As noted above, Dr. Russell conducted a bonding evaluation of the Parents and the Children during which he observed a two-hour visit. N.T., 4/3/18, at 30. Dr. Russell testified that the Children knew the Parents and interacted with them comfortably. *Id.* at 31. However, they separated from the Parents at the conclusion of the visit without difficulty. *Id.* at 34. Dr. Russell opined that the Children enjoy the company of the Parents, but that they do not view them as the central figures in their lives. *Id.* at 34-35. He further opined that terminating the Parents' rights would not cause the Children to suffer irreparable harm. *Id.* at 54.

Dr. Russell testified that the most crucial aspect of his opinion was that the Children demonstrated significant improvement while in foster care. *Id.* at 35. He cautioned that prolonging visitation with the Parents could interfere with that improvement. *Id.* at 86. He stated,

> . . . . [T]he [C]hildren have been out of the [P]arents' care for a long period of time and have demonstrated significant improvements predicated upon the environments they've been in.
>
> Now, ongoing, I believe that if the visitation continues, it will interfere with that structure. The [C]hildren need a sense of permanency in order to develop and thrive. The longer we continue with visitation in these situations, the longer you're denying that ability to move forward. You're interfering with that. Whether and how much of an impact it will have, at this point I did not feel professionally that separating those children from their parents would create any significant impact.

*Id.*

Accordingly, the record is clear that terminating Mother's parental rights would best serve the Children's needs and welfare. At the time of the hearing,

the Children had resided for nearly a year and a half in foster care. H.D.H. was now seven years old, A.E.H. was five years old, and A.L.H. was two years old. Despite numerous opportunities to improve, Mother remained incapable of parenting them and providing for their needs. *See C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Moreover, while the Children were familiar with Mother, they did not share a parental bond with her, such that terminating her parental rights would cause them to suffer irreparable harm. If anything, the record indicates that preserving Mother's rights may harm the Children by interfering with their progress in foster care. We discern no abuse of discretion.

**Father's appeal**

We now turn our attention to Father's appeal. In his first claim, Father argues that the orphans' court abused its discretion by terminating his parental rights pursuant to Section 2511(a)(2). Father challenges Dr. Russell's conclusion that he displays parental incapacity. He contends that that he does not suffer from intellectual limitations or mental illness, that he is addressing his drug use and domestic violence issues, and that he maintains stable employment and housing. Father's Brief at 9-11. Father insists that, to the extent he does display parental incapacity, further reunification services may remedy this problem. *Id.* at 10-11. In addition, he contends that Dr. Russell relied on the Children's special needs when reaching his conclusion. *Id.* at 11. However, Father asserts that A.L.H. does not have special needs,

and that we consider her circumstances separately from those of the other Children. *Id.*

Contrary to Father's contentions, the record is replete with evidence to support the trial court's conclusion that Father lacks the capacity to parent the Children. In addition to the evidence discussed supra, the record reveals that Father abused Adderall throughout much of the Children's dependency. Ms. Mongan testified that Father obtained a drug and alcohol evaluation in 2016. N.T., 12/12/17, at 31. The evaluation indicated that Father "was speedballing on Adderall and that he needed to go into a detox and get off Adderall altogether and then come back for another evaluation." *Id.* at 65-66. However, Father did not begin substance abuse treatment until after his arrest in February 2017. *Id.* at 31. Father attended a rehabilitation program, but the program discharged him for selling Suboxone to other patients. *Id.* at 32. Father then attended a second rehabilitation program, which he completed in April 2017. *Id.* at 31-32, 67. Father's discharge recommendations included attending intensive outpatient treatment, but he failed to comply. *Id.* at 32. In addition, Father continued to test positive for Adderall as recently as July 17, 2017. *Id.* at 34, 73.

Ms. Mongan testified that Father did not begin making progress toward completion of his FSP goals until August 2017, over a year after the Children entered foster care. *Id.* at 21. Specifically, Father began attending intensive outpatient treatment as well as a parenting program. *Id.* at 68, 78. Father's therapist also indicated that he would begin an anger management program.

*Id.* at 36.  Given Father's inaction, Ms. Mongan opined that he lacked the capacity to meet the Children's needs.  *Id.* at 45-46, 49.  Like Mother, Father had demonstrated that he could not even meet his own needs, and did not make efforts to learn how to address the autism of H.D.H. and A.E.H.  *Id.* at 39, 49, 120.

Dr. Russell presented a similar opinion.  He testified that Father is an "immature, easily off-kiltered young individual, one who manifests difficulties in control and behavior in a sense that he's always jittery, he's always hyper. Again, symptoms consistent with an attention deficit disorder, so he's always feeling restless."  N.T., 4/3/18, at 25.  In addition, Dr. Russell expressed concern regarding Father's history of substance abuse and domestic violence involving Mother.  *Id.* at 24-25.  He observed that Father reported wanting to parent the Children so that he could "redeem" himself, rather than for the intrinsic joy of being a parent.  *Id.* at 26.  He also minimized his role in the circumstances leading to the Children's placement.  *Id.* at 29.

While Dr. Russell acknowledged that Father made some recent progress, he cautioned that returning the Children to Father's care could endanger that progress by placing him under increased stress.  *Id.* at 58-59.  He explained:

> What we do know is that your client, [Father], comes to the table with a fairly lifelong substance abuse problem.  He's been clean for seven, eight months now.  That's just getting started. As I said, I haven't had access to any of those most recent treatment notes, but given that it is that significant of a problem he's just getting started.

So whether he would continue to improve, well, we know that many of the -- one of the more frequent causes of substance relapse is stress. And if you take an individual in a situation where he's going to have to care for four children, two of which are autistic, stress level is going to go right through the roof. If you put him in a situation where concomitantly there's some difficulties in the parental interaction, the couple interaction, the stress is going to continue to go up. That history is clearly there. . . .

*Id.*

Thus, we discern no abuse of discretion by the orphans' court. Prior to the Children's placement in foster care, Father neglected their medical and developmental needs. After the Children's placement, Father committed acts of domestic violence and abused Adderall. Father was even more recalcitrant than Mother, in that he delayed until August 2017 before making progress on his FSP goals. Father's actions and inactions make it clear that he is incapable of parenting all three Children, not just H.D.H. and A.E.H. Further, additional reunification services will not remedy his parental incapacity at any point in the foreseeable future. Father's first claim merits no relief.

In his second claim, Father argues that the orphans' court abused its discretion by terminating his parental rights pursuant to Section 2511(b). He challenges Dr. Russell's conclusion that the Children do not share a bond with him. Father observes that H.D.H. and A.E.H. are autistic and complains that Dr. Russell failed to address how autism affects bonding. Father's Brief at 9. He also attempts to justify his lack of a bond with the Children, by suggesting that whatever bond they had with him prior to entering foster care may have weakened over time. *Id.* Father acknowledges that the Children made

progress while in foster care, but asserts that they may also have made progress if the juvenile court had reunited them with him and provided services. *Id.* at 10-11.

We conclude that Father is not entitled to relief. Father waited over a year before he began making progress toward completion of his FSP goals. By the time of the termination hearing, the Children had resided in foster care for nearly a year and a half, and Father remained incapable of providing them with a safe and appropriate home. Moreover, as discussed during our review of Mother's appeal, the record confirms that the Children do not have a significant bond with Father and terminating his parental rights would not cause them to suffer irreparable harm. To the contrary, preserving Father's parental rights may harm the Children by impairing their progress in foster care.

In reaching this conclusion, we reject Father's assertions that the autism of H.D.H. and A.E.H. may have affected their bonding, and that the Children may have had a stronger bond with him prior to their placement. Father's arguments are speculative and lack support in the record. In addition, the strength of the Children's bond with Father now is what matters, not whether they had a bond with him in the past. *See N.A.M.*, 33 A.3d at 103 (explaining that Section 2511(b) requires courts to consider whether terminating parental rights would sever an existing parent/child bond). The record also refutes Father's claim that the Children may have progressed equally well if the juvenile court had returned them to his care and provided services. It is clear

that Father's neglect, substance abuse, acts of domestic violence, and refusal to cooperate with services did not make him an appropriate caregiver.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating the Parents' rights to the Children involuntarily. Therefore, we affirm the court's April 6, 2018 decrees.

Decrees affirmed.

President Judge Emeritus Ford Elliott joins the memorandum.

Judge Nichols concurs in result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/18